IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

| | | |
|---|---|---|
| MARY BEARDEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| | * | |
| vs. | * | No. 5:06cv0037 SWW |
| | * | |
| | * | |
| | * | |
| | * | |
| INTERNATIONAL PAPER COMPANY, | * | |
| | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER

This is a case of alleged employment discrimination in which plaintiff Mary Bearden, a former employee of defendant International Paper Company ("IC"), asserts claims of sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*., age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq*., pay discrimination in violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d), and defamation of character in violation of state law. The following motions are before the Court: (1) plaintiff's motion for summary judgment on the issue of liability [doc.#50]; and (2) IP's motion for summary judgment [doc.#54]. Plaintiff has filed a response in opposition to IP's motion for summary judgment, IP has filed a response in opposition to plaintiff's motion for summary judgment on the issue of liability, and plaintiff and IP have each filed a reply to the response to their respective motions for summary judgment. Having considered the matter, the Court denies plaintiff's motion for summary judgment on the issue of liability [doc.#50] and grants IP's motion for summary judgment [doc.#54].

I.

Plaintiff was born in February 1949 and received a two-year degree in mechanical drafting from Southeast Arkansas Junior College in 1972.  Plaintiff began working at IP in March 1973 as a draftsman.  Plaintiff was terminated from her employment on September 1, 2005, at the age of 56, after she altered a requisition that had already been approved to purchase a bicycle for her husband that was to be used in his work for IP as a maintenance mechanic.

At the time of her termination, plaintiff was a Purchasing Supervisor, having received that title in September 2004.  Previously, plaintiff was a Buyer, a position which she had held since March 2001, with a pay grade at Placement Level (PL) 8.  Plaintiff sought to become a Senior Buyer to increase her PL, but the Mill did not have that position after April 2004 because of a corporate program, "One Job, One PL."  Because plaintiff's PL could not be increased as long as she remained a Buyer, she needed to be placed in a different position that was graded at a higher PL.  Consequently, the Mill had to engage in negotiations with corporate management to move plaintiff to a PL 10 position, with the title of "Purchasing Supervisor."  The Mill was granted an exception to give plaintiff the Purchasing Supervisor title, even though plaintiff would not be supervising any employees.  The PL increase to 10 occurred on September 1, 2004.  Both Buyers and Purchasing Supervisors were responsible for negotiating contracts with suppliers for the Mill and purchasing items not maintained in stock, and plaintiff's duties did not change when she became Purchasing Supervisor, which at the time of her termination entailed purchasing for the Pulp and Power area and purchasing some environmental source materials.[1]

---

[1] Plaintiff agrees there was testimony concerning the circumstances surrounding her title change from Buyer to Purchasing Supervisor and that her duties did not change, but states that "she has no knowledge of [those] assertions, and thereby denies same."  Plaintiff does not explain how she would have no knowledge of whether her duties changed when her job title changed and this Court thus determines she does not dispute that her job duties did in fact remain the same.

IP's Pine Bluff Mill has a process for the approval of purchase order requisitions that was in place at the time of plaintiff's termination.  Once purchase order requisitions were created, they were to be signed by the appropriate department supervisor and/or manager.  Maintenance or repair related requisitions were to be signed by the maintenance manager.  The approved requisitions were to be deposited with the Purchasing Department, which would review the requisitions to ensure that they had proper authority.  The Purchasing Department would then submit department signed requisitions each day to the Mill Manager, Calvin Staudt, Operations Manager, Dane Griswold, and Mill Controller, Kenneth Baymiller, for a requisition review meeting.  All requisitions were to be reviewed and signed at that meeting.  Requisitions that were not approved at the meeting were returned to department managers for review and re-submission.  Approved purchase orders were returned to Purchasing for processing.

Richard Bearden is plaintiff's husband and is employed at IP as a general mechanic in the Hyster Shop.  Bearden has used a bicycle to get around the plant and transport material and tools.  The bicycle used by Bearden was damaged in the Finishing and Shipping Department and apparently rendered unusable.  Although Bearden could perform his job without the bicycle, he would not have wanted to wait six months for a new bicycle.  Bearden asked Dwight Hedden, Operation Manager for the Finishing and Shipping Department at the Pine Bluff Mill, if he could get his bicycle replaced.  Hedden states he agreed to see what he could do about getting the bicycle replaced, but that his supervisor, Department Manager Scott Spence, must first authorize the purchase.  Hedden states he twice submitted requisitions to Spence, but that Spence rejected both requisitions, and that he never submitted another requisition to Spence.

Plaintiff states Hedden told her he was having trouble getting a purchase requisition

through and that she told him to "buy it on [his] charge card," but that he said, "Mine is maxed out."  Plaintiff states she didn't purchase the bicycle with her own corporate charge card "because you had to track down the paperwork for it.  And then you had to – it's more work for me."[2]

Meanwhile, Maintenance Analyst Karen Jackson submitted a requisition for approval of one bicycle for the maintenance area.  The bicycle was to be charged to cost center 39555271, which was for maintenance area 271.  Jackson's requisition went through the proper approval process and was signed by her department manager, the maintenance manager, and the operations manager.  One bicycle for Charles Driskell was approved and Griswold's initials represented the final approval for the purchase of the bicycle.  However, plaintiff subsequently altered Jackson's requisition in the sum of $563.00 by crossing out the quantity so that the requisition called for the purchase of two bicycles rather than the one Jackson had originally requisitioned for her department.  Plaintiff admits her handwriting appears at the bottom of he requisition stating "1 for the Hyster Shop."  As a result of the change plaintiff made to Jackson's requisition, which was without Jackson's knowledge, a purchase order was issued for two bicycles and the purchase order stated "1 for the Hyster Shop."  Both bicycles were charged to the work area for the number 2 paper machine and the bicycle for plaintiff's husband was not charged to Hedden's cost center.

On July 29, 2005, Spence and Jeff Winkler, Area manager for Maintenance, noticed that Bearden had a new bicycle.  Spence confronted Hedden and confirmed that he had not used his

---

[2] Plaintiff had a credit card on which she could make a single purchase of $1,000 in a month.  When a requisition is changed, no documentation of the change is created.  When a purchase order is changed, an exception report is created to document that change.

corporate credit card to purchase the bicycle.  Plaintiff states she found out Spence was asking

about the bicycle and caught him in a hallway and told him what she did – that she had added the

bicycle to another requisition.[3]  Plaintiff apologized to Spence and told him that she would not

do it again.  Plaintiff states Spence told her he wasn't getting the production he wanted and

didn't want to make any purchases, and that she told Spence not to worry about the bicycle

hitting his cost center.  Plaintiff did not remember being told by Spence that her job was in

jeopardy.

Plaintiff states she did not speak to Spence before she changed the requisition to purchase

the bicycle because she did not know it was his decision and that Hedden, as the supervisor over

her husband's department, "had the authority to tell me to get one" (although plaintiff does not

know whether Hedden is a department head).  Plaintiff states Hedden asked her to help replace

her husband's bicycle (although she could not remember when that occurred), but Hedden states

he never told plaintiff to alter a requisition to purchase a bicycle for her husband.  Plaintiff

acknowledges that Hedden had not specifically told her he had authorized the purchase of a

bicycle for her husband.

Plaintiff was called into the office of Steve Estes, Human Resources Manager for the

Pine Bluff Mill, who told her that the bicycle purchase for her husband was an "unpleasant

situation."  Plaintiff states that Baymiller, who was also present, told her that she didn't have

authorization to change a requisition.  Although plaintiff states she told Baymiller that

"[m]aintenance people have a bike," that "it's being used for International Paper's purposes,"

and that "[i]t wasn't going to any personal benefits for anybody in any direction," Baymiller told

---

[3] When Richard Bearden found out from Winkler that Spence was asking questions about the purchase of the bicycle, Bearden told Winkler to tell Spence that "it wasn't any of his business."

her the changing of the requisition "was a breach of company policy, a betrayal of trust." Management believed that plaintiff was aware of the fact that Spence had denied purchase of the bicycle, although plaintiff denies that she knew management had denied purchase of the bicycle. Plaintiff also states she "believe[d]" she had the authority from Baymiller to change requisitions and identifies Robert Traweek, Manager of Purchasing and Stores (spelled "Traywick" in her deposition), as a person with knowledge of her claim and represents that he would state that changing the requisition in the manner in which she did was "standard practice."[4]  There is no deposition testimony or declaration of Traweek included in the record, however.

On August 17, 2005, plaintiff met with Staudt and Estes.  Staudt told plaintiff that she had lied and was deceitful and had committed a breach of trust.  Staudt told her he wanted her out of the plant and that he would let her know his decision regarding her continued employment.[5]  Shortly thereafter, plaintiff was terminated for modifying a requisition without proper authority to purchase a bicycle for the use of her husband that had previously been denied by management.

## II.

Plaintiff moves for summary judgment on the issue of liability and opposes IP's motion for summary judgment on grounds that her discharge, rather than for violations of company policy, was due to gender and age discrimination, that at the time of her discharge, she was paid less than a certain male employee of IP performing the same or similar work, and that IP

---

[4] Plaintiff states that "as far as I know" she had the authority to change requisitions up to $5,000 without additional authorization.

[5] Plaintiff did not tell Baymiller, Estes or Staudt that Hedden had played any role in the purchase of the bicycle.

defamed her by stating she was discharged for being dishonest.

A.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

B.

1.

The Court first addresses plaintiff's claim of gender discrimination. Because no direct evidence supports plaintiff's gender discrimination claim, this Court analyzes her claim under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework. *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007).[6]  To establish a prima facie case of gender discrimination, plaintiff must establish (1) she was a member of a protected class, (2) she was qualified to perform her job, (3) she suffered an adverse employment action, and (4) she was treated differently than similarly situated males or there is some other evidence that would give rise to an inference of gender discrimination. *Id.*; *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005).  The establishment of a prima facie case creates a presumption of unlawful discrimination, which in turn requires a defendant to come forward with evidence of a legitimate, nondiscriminatory reason for the defendant's actions. *McGinnis v. Union Pacific Railroad*, — F.3d —, 2007 WL 2214432, at * 2 (8th Cir. Aug. 3, 2007).  If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual. *Id.*

a.

Plaintiff attempts to meet the fourth element of the prima facie burden by first showing

---

[6] Direct evidence is evidence that establishes a specific link between the alleged discriminatory animus and the challenged action, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision. *Shaffer v. Potter*, — F.3d —, 2007 WL 2376770, at * 2 (8th Cir. Aug. 22, 2007) (citations omitted). Direct evidence includes evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor. *Id.* Plaintiff has failed to present such direct evidence of gender discrimination (or, as will be addressed later, age discrimination).

that she was treated differently from similarly situated males.  This requires evidence that plaintiff and her male co-workers were involved in or accused of the same or similar conduct and were disciplined in different ways.  *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 852 (8th Cir. 2005).  Given that plaintiff does not dispute that IP has proffered a legitimate, nondiscriminatory reason for the adverse employment action taken against her – that plaintiff was terminated for making unauthorized use of IC funds by altering a requisition after it had gone through the proper approval process to purchase a bicycle for the use of her husband that management had denied –, and plaintiff has presented whatever evidence she has to show that the proffered reason was a pretext for discrimination, this Court will assume that plaintiff has presented a prima facie case of gender discrimination with respect to her termination and will focus on the pretext stage of the *McDonnell Douglas* burden-shifting framework.  *See Rodgers*, 417 F.3d at 856 (Colloton, J., concurring).[7]

   Where a pretext argument is based on comparisons of employees, a plaintiff must show that employees are similarly situated in all relevant aspects.  *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994).  The test to determine whether employees are "similarly situated" to warrant a comparison to plaintiff is, as previously noted, a "rigorous" one.  *Id.  See also Rodgers*, 417 F.3d at 853; *Equal Employment Opportunity Commission v. Kohler Co.*, 335 F.3d 766, 775 (8th Cir. 2003).  "'Instances of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of proving that he and the disparately treated [employees] were

---

[7] For purposes of establishing a prima facie case of disparate treatment, the Eighth Circuit in *Rodgers* adopted a "low-threshold" standard for determining whether employees are similarly situated as the burden of establishing a prima facie case of disparate treatment is not onerous.  417 F.3d at 852-53.  At the pretext stage, however, the test for determining whether employees are similarly situated is a "rigorous" one.  *Id.* at 853.  Hence, this Court's determination, on this record at least, to proceed directly to the pretext stage of the *McDonnell Douglas* burden-shifting framework in addressing whether the employees identified by plaintiff were similarly situated.  *See id.* at 856 (Colloton, J., concurring).

similarly situated in all relevant respects.'" *Id.* at 775-76 (quoting *Lynn v. Deaconess Medical Ctr.-West Campus*, 160 F.3d 484, 487 (8th Cir. 1998)).  "Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  *Id.* at 776.  To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness.  *Id.  See also Rodgers*, 417 F.3d at 853.

Plaintiff apparently identifies the following male employees as comparators similarly situated to her: James Curtis, Dennis White, Barney Burns, and John Smith.[8]  For the reasons that follow, plaintiff has not demonstrated pretext based on comparison of employees as none of the comparators she identifies are similarly situated to her.

James Curtis, a Project Engineer at IC, was not similarly situated to plaintiff as Curtis reported to Jimmy Bruce, a Manager at the Mill, whereas plaintiff's direct supervisor was Tom Eikamp, Manager of Purchasing and Stores.  Moreover, plaintiff's and Curtis' conduct was not comparable as Curtis was disciplined by Staudt for overrunning purchase orders and failing to maintain paperwork with regard to capital projects, whereas plaintiff altered an already approved requisition to expend company funds on her husband's behalf to purchase a bicycle that management had disapproved.  In addition, Curtis' work was approved by all levels of management.  Although plaintiff states that this was not always so, she does not provide any such instances.

---

[8] *See* Pl.'s Br. in Supp. of Mot. for Summ. J. on the Issue of Liability at 11 [doc.#51] ("the appropriate comparators to plaintiff would be Smith and White ..."); Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 8-9 [doc.#62] (identifying Smith, White and Curtis as comparators), and at 13 (identifying Smith, White, Curtis and Burns as comparators, although on that same page stating "the appropriate comparators to plaintiff would be Smith and White ..."); Pl.'s St. of Mat. Undisp. Facts for Which There are Genuine Issues For Trial at ¶ 4 [doc.#63] ("Plaintiff, Smith, White, Curtis and Burns were similarly situated in all relevant respects without any mitigating or distinguishing circumstances").

Dennis White, a Manager at the Pine Bluff Mill, was not similarly situated to plaintiff as their conduct was not comparable.  White was counseled by Estes and Staudt for committing a violation of the lock-out/tag-out safety policy and was suspended for three days for the violation. White was not terminated, however, because the violation did not, according to Estes and Staudt, involve in that particular instance a life and death situation.  Plaintiff asserts that White's failure to lock-out/tag-out was a safety violation which "could have resulted" in serious injury or death but she doesn't specifically assert that White's violation was in fact a life and death situation. Plaintiff's St. of Mat. Undisp. Facts at ¶ 16 [doc.#52].[9]

Barney Burns, a Storeroom Supervisor, was not similarly situated to plaintiff as Burns was found by an audit team to have security violations in his area and plaintiff acknowledges that she cannot provide any examples of actions similar to her own that were taken by Burns.

The comparator whose conduct most closely resembles that of plaintiff is John Smith, a Process Manager in the maintenance department.  An audit was conducted to determine whether managers were conducting one-on-ones with their employees and Smith submitted a one-on-one form that appeared to have been altered by changing a date from July 2004 to July 2005.  It was determined that Smith had in fact conducted the one-on-one, but he could not find documentation to prove that he had.  Smith was disciplined by Estes and Jeff Winkler, Area Manager for Maintenance, for modifying an existing document by changing a date.  Smith was not terminated, but a letter was placed in Smith's file, and his evaluation was downgraded to "did not meet expectations" and his merit increase was significantly impacted.

---

[9] Plaintiff elsewhere states, without reference to the record, that such a violation "always involves" a life and death situation, *see* Pl.'s Resp. to Def.'s St. of Undisp. Mat. Facts at ¶ 127 [doc.#64], but plaintiff cannot create a fact dispute with her own conflicting assertions.

Plaintiff and Smith were not similarly situated in all relevant respects as both had different supervisors: Plaintiff was supervised by Eikamp and her discipline for altering the requisition was administered by Staudt, while Smith was supervised by Winkler, who had no role in disciplining plaintiff.  *See Gilmore v. AT & T,* 319 F.3d 1042, 1046 (8th Cir. 2002) (comparator "was not similarly situated because his discipline was not administered by the same supervisors who administered [plaintiff's] discipline").  Plaintiff points to nothing in the record indicating Staudt was specifically involved in Smith's discipline; Staudt is not referenced in the write-up that was given to Smith by Winkler, although Staudt did apparently agree that a counseling letter be placed in Smith's personnel file.[10]  In any case, plaintiff's and Smith's conduct was not of comparable seriousness as plaintiff did not simply alter a document by changing a date to confirm an action that had actually taken place, as did Smith, but instead altered an already approved requisition to expend company funds on her husband's behalf to purchase a bicycle that management had disapproved.  Plaintiff fails to present evidence of a similarly situated male who was not terminated for altering an already approved requisition, much less one to purchase an item that had been disapproved.  *See Shaffer*, — F.3d —, 2007 WL 2376770, at * 4.  Plaintiff, as previously noted, states she "believe[d]" she had the authority to change requisitions and identifies Traweek as a person who state that changing the requisition in the manner in which she did was "standard practice," but she does not include any deposition

---

[10] Plaintiff references the depositions of Estes and Staudt in asserting that "Staudt disciplined Smith by instructing that his evaluation be downgraded to 'unacceptable' and that a counseling letter be placed in his personnel file, but continued his employment."  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 9 [doc.#62].  Staudt, however, only stated in the referenced portion of his deposition that he believes falsifying company documents to be a violation of IP policy.  Staudt did not reference Smith in that discussion.  For his part, Estes acknowledged in the referenced portion of his deposition that he approved a counseling letter being placed in Smith's file.  When asked if Staudt agreed that Smith needed to have the letter placed in his personnel file, Estes states, "He did."  When next asked if "He (Staudt) made that statement?," Estes replied, somewhat cryptically, "He (Smith) did have a document placed in his personnel file."

testimony or declaration of Traweek, nor does she cite to any evidence in the record, other than her own declaration and deposition, indicating she had the authority to change requisitions.  *See Senty-Haugen v. Goodno*, 462 F.3d 876, 891 (8th Cir. 2006) (summary judgment proper where contention is unsupported by anything other than plaintiff's own allegations).[11]

b.

Plaintiff also asserts pretext by claiming that IP "has a history of gender discrimination in terms and conditions of employment, including pay and promotions."  But none of the evidence plaintiff submits in support of this claim demonstrates that IP's legitimate, nondiscriminatory reason for terminating plaintiff is pretextual.

Plaintiff first points to a May 2002  letter of resignation from Carolyn Wright in which, according to plaintiff, Wright outlines detailed instances of what Wright "felt" was discriminatory conduct.  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 14 [doc.#62].  This letter, however, predates plaintiff's termination by more than three years and, thus, cannot speak to any actions that occurred after May 2002.  In any case, much of the letter concerns hearsay and mere opinion as to what Wright claims was improper conduct – such as lack of communication, attitude problems, lack of respect, and ego – that does not go to the issue of gender discrimination.[12]

---

[11] Plaintiff does cite to the deposition excerpts of Richard Hundley, Manager of Purchasing and Stores (who succeeded Traweek upon his retirement) and Eikamp in support of her claim, but neither of these individuals testified in those excerpts that plaintiff had authority to change requisitions in the manner in which she did with respect to the bicycle.

[12] Interestingly, Wright complains in her resignation letter that it was *plaintiff* who at times was given better treatment than she.  Wright states that when Brian Hundley asked where she stood on her objectives for the year and she responded that due to a rebuilding project and vacation she had not accomplished anything, Hundley cited her for lack of accomplishment, but that when plaintiff was asked the same question and gave basically the same answer, Hundley told her that it was ok and he understood.  Wright also states that she was discriminated against by being denied a position in the Storeroom because she was told she had to have a college degree and certain experience, but that plaintiff, among others, was able to move into the

Plaintiff next argues that when she was employed at IC, female Engineer Sara Pates and male Engineer John Curtis had the same job title and yet Pates had a lower PL. The record, however, indicates otherwise. Pates was hired in September 2000 as a Project Engineer and her salary as a new college graduate with a Masters Degree in chemical engineering was $54,000 with a PL assignment of PL 5. In December 2001, Pates was promoted to Laboratory Supervisor and she was assigned a PL 9 with a salary of $64,019. As a result of the "One Job, One PL" program administered in April 2004, the PL for the Lab Supervisor job increased to PL 12, and Pates' new salary was $73,351. In October 2004, Pates was promoted to Area Process Manager – Extrusion and her PL increased to PL 14 with a salary increase to $81,000. Following merit increases, Pates' salary as of April 2006 was $85,931.

In contrast, when Curtis, who had a degree in Mechanical Engineering, was hired as a Senior Design Engineer in August 1998 (two years earlier than Pates), he had seven years of experience at Ethyl Corporation and he was assigned a PL 11 with a salary of $63,000. In June 2001, Curtis' job title changed to Department Engineer, his PL was increased to PL 13, and his salary increased to $73,693. Following merit increases, Curtis' salary was increased in April 2003 to $77,801. As a result of the April 2004 "One Job, One PL" program, Curtis' PL did not change, but he received a merit increase which resulted in a salary of $80,135. Following additional merit increases over the ensuing years Curtis' salary as of April 2006 was $84,173, *less* than Pates' salary of $85,931. Thus, Pates and Curtis have not had the same job titles and Pates' PL and salary exceeds that of Curtis.

Plaintiff next argues that Staudt and Estes failed to follow IC's termination procedure for

---

Storeroom without a college degree and the required experience.

salaried employees, referencing their testimony that they did not know it existed.  But the failure

of Staudt and Estes to follow a termination procedure they did not know existed cannot be

evidence of pretext since they obviously were not following the policy as to any employees at IC

(and plaintiff has not presented any such evidence).[13]

Plaintiff next argues that upon Hundley's departure from IP she applied for the Manager

of Purchasing and Stores position but that the position was given to Eikamp.  Plaintiff states that

IP "refused to fill the position from within because it, more likely than not, would have meant

that plaintiff would have received the job."  But this is nothing more than rank speculation

insufficient to establish pretext.  Moreover, Eikamp, who is older than plaintiff, has a four year

degree from Rutgers and more experience than plaintiff.

Plaintiff next argues that the Pine Bluff Mill purchased shirts from My Child's Closet, a

business owned by the wife of Manager Jimmy Bruce, and that this purchase was thus "suspect"

and a conflict of interest in violation of policy.  Certainly, the policies to which plaintiff refers

encourage employees to avoid or eliminate conflicts of interest or the appearance of conflicts of

interest, but IP management did not view the purchase of the shirts as a violation.  These shirts

were to be embroidered with IP's logo, among others, and were purchased in conjunction with a

customer visit with the approval of the Mill Manager, Operations Manager, and the Plant

Controller.  Although the shirts were purchased without the creation of a requisition, IP allows

some purchases to the made without first creating a requisition, such purchases being called "No

Po's" because no purchase order is created.  The decision was made to use the No Po process to

---

[13] Plaintiff also argues that while IP might not have a written progressive discipline policy, it nevertheless must have such a discipline policy for salaried employees because certain employees, namely Smith, Curtis, White, and Burns, received discipline different than she.  As previously noted, however, the Court has determined that those employees to whom she compares herself are not valid comparators.

pay for the shirts, obviating the need to fill out a requisition as no purchase order was created. Plaintiff does not dispute the No Po process but merely states that IP served voluminous documents on plaintiff without identifying specific ones and that "if the 'No Po' policy was served, it was an oversight by plaintiff."  In any case, the purchase of the shirts from My Child's Closet differs fundamentally from plaintiff's altering an already approved requisition and simply is not evidence of disparate treatment from which an inference of discrimination can be inferred.

## 2.

The Court now turns to plaintiff's claim of age discrimination.  The ADEA makes it unlawful for an employer to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.  29 U.S.C. § 623(a)(1).  Protection under the ADEA extends to persons age forty and older.  29 U.S.C. § 631.  *See also Denesha v. Farmers Ins. Exchange*, 161 F.3d 491, 497 (8th Cir. 1998); *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004).  To establish a claim under the ADEA, a plaintiff must show that his employer intentionally discriminated against him.  *Ziegler v. Beverly Enterprises-Minnesota, Inc.*, 133 F.3d 671, 674 (8th Cir. 1998) (citations omitted).  To avoid summary judgment in a case where, as here, there is no direct evidence of intentional discrimination, plaintiff, under the *McDonnell Douglas* framework, must establish a prima facie case of age discrimination by producing evidence that (1) she is a member of a protected age group; (2) she was qualified to perform her job; (3) she was discharged; and (4) she was replaced by another person sufficiently younger to permit the inference of age discrimination.  *McGinnis*, — F.3d —, 2007 WL 2214432, at * 4; *Hammer v.*

*Ashcroft*, 383 F.3d 722, 726 (8th Cir. 2004).  Once the plaintiff establishes a prima facie case of age discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision.  *Thomas v. Corwin*, 483 F.3d 516, 528 (8th Cir. 2007).  If the employer provides a nondiscriminatory reason, the presumption of discrimination disappears, and the burden shifts back to the plaintiff to show that the proffered reason is actually a pretext for intentional discrimination.  *Zeigler*, 133 F.3d at 675.

Plaintiff has not established a prima facie case of age discrimination as she has not shown that she was replaced by another person sufficiently younger to permit the inference of age discrimination.  Rather, plaintiff only states, citing to her own declaration, that "[t]he fourth requirement is met because prior to her discharge Bearden was directed by Eikamp to assist with training Maureen Woods as a buyer.  Bearden believes that Woods is younger than she and that she was assigned to assume her buying responsibilities after she was terminated."[14]  Plaintiff's mere "belie[f]" that Woods was younger than she and assumed her duties is hardly sufficient to demonstrate a prima facie case of age discrimination, *see Thomas*, 483 F.3d at 530 ("Skeletal allegations unsupported with specific facts or evidence, are insufficient to create a genuine issue of material fact so as to preclude summary judgment"), and, in fact, Woods was born on December 9, 1956, *see* Estes Second. Decl. at ¶ 29, making her just shy of 49 at the time of plaintiff's termination, and evidence of record indicates that plaintiff's duties were taken over by Eikamp.  *See* Eikamp. Decl. at ¶¶ 3-4.

Even if it could be concluded plaintiff established a prima facie case of age

---

[14] In her brief in support of her motion for summary judgment on the issue of liability, plaintiff states "it is obvious that the defendant had plaintiff's departure in mind when it directed her to assist Woods, who is younger than she, with learning the buying job."  In her statement of undisputed material facts, plaintiff states, without referencing the record, that Woods "is 40 years old or younger" and that Woods "was assigned [her] buying duties after she was discharged."

discrimination, plaintiff's age discrimination claim fails because, for the reasons previously

stated, she has not demonstrated that IP's nondiscriminatory reason for her termination was

actually a pretext for intentional discrimination.  Plaintiff claims IC's decision was erroneous,

but "poor administration and even erroneous decisions cannot constitute sex or age

discrimination, when, as here, a reasonable fact finder could not infer a discriminatory motive."

*Dodd v. Runyon*, 178 F.3d 1024, 1030 (8th Cir. 1999).

3.

The Court now turns to Plaintiff's EPA claim, addressing first IC's argument that

plaintiff's EPA claim is time-barred.  29 U.S.C. § 255(a) sets forth the applicable statue of

limitations for claims brought under the EPA and provides that a cause of action under the EPA

must be brought within two years after the cause of action accrued for a general violation.  A

claim charging denial of equal pay accrues anew with each paycheck.  *Weber v. United States*,

71 Fed.Cl. 717 (2006) (each instance of discriminatory pay is a discrete act and therefore

embodies a separate cause of action for purposes of the statute of limitations).  Accordingly, this

Court is barred by the statute of limitations from entertaining any of plaintiff's EPA claims that

arose before February 16, 2004 – two years prior to the filing of this action.  *Gandy v. Sullivan

County, Tenn.*, 24 F.3d 861, 864 (6th Cir. 1994).[15]

---

[15] For a "willful" violation, a cause of action under the EPA must be brought within three years after the cause of action accrued.  A finding of willfulness requires behavior on the part of the employer that exceeds negligence; the employer must act knowingly or with reckless disregard of whether the contested conduct was prohibited.  *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 580 (8th Cir. 2006).  Plaintiff makes a conclusory allegation of willfulness in her amended complaint but she does not address the issue of willfulness in her summary judgment papers, and she apparently acknowledges that the alleged EPA violations of which she complains are based on events immediately preceding her termination.  *See* Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 5, 27 [doc.#62] ("About one year before her discharge plaintiff learned that Burns was being paid a PL11," and "[w]hen plaintiff was discharged on September 1, 2005, she was being paid less than Burns, and the EPA violation was a current one").  Accordingly, two years prior to the filing of plaintiff's complaint will be the cut-off date for

To establish liability under the EPA, an employee must prove that her employer discriminated on the basis of sex by paying different wages to men and women who performed equal work.  29 U.S.C. § 206(d)(1); *Tenkku v. Normandy Bank*, 348 F.3d 737, 740 (8th Cir. 2003).  Application of the EPA depends not on job titles or classifications but on the actual requirements and performance of the job.  *Holland*, 487 F.3d at 645.  Under the EPA, a plaintiff must establish a prima facie case by showing that the defendant paid male workers more than she was paid for equal work in jobs that required equal skill, effort, and responsibility and work performed under similar conditions.  *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003) (citations omitted).  If a plaintiff makes this showing, the burden shifts to the defendant to prove any one of the four statutory affirmative defenses set forth under the EPA.  *Id.  See also Tenkku*, 348 F.3d at 740.

In her summary judgment papers, plaintiff bases her EPA argument on a comparison between herself and Barney Burns.  Pl.'s Br. in Supp. of Mot. for Summ. on Issue of Liability at 15-23 [doc.#51]; Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 19-27 [doc.#62].  Plaintiff states that about one year before her discharge, she learned that Burns was being paid a PL 11, and that in June or July 2004, she complained to Estes and Baymiller that the Storeroom Supervisor job held by Burns was a PL 11.  Plaintiff, however, has not demonstrated a prima facie case by showing that she was paid less than Burns for equal work on jobs the performance of which required equal skill, effort, and responsibility.  29 U.S.C. § 206(d)(1).[16]

---

consideration of her EPA claims (although going back three years would lead to the same result).  In addition, this Court, having reviewed plaintiff's amended complaint and summary judgment papers, construes plaintiff's amended complaint as asserting her claim of unequal pay strictly pursuant to the EPA and not Title VII, and the Supreme Court's recent decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S.Ct. 2162 (2007), therefore has no bearing on her pay claim.  *Id.* at 2165, 2176.

[16] Accordingly, IP's potential affirmative defenses, on which it bears the burden of proof, are not at issue.  *Tenkku*, 348 F.3d at 741.

To be considered "equal" under the EPA, two jobs need not be identical, only "substantially equal." *Simpson*, 441 F.3d at 578 (internal quotations omitted). Whether two jobs are substantially equal, entailing equal skill, effort, and responsibility, requires a practical judgment on the basis of all the facts and circumstances of a particular case. *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 719 (8th Cir. 2000) (citations omitted). Skill includes such considerations as experience, training, education, and ability. *Id*. Effort refers to physical or mental exertion needed to perform the job. *Id*. Responsibility concerns the degree of accountability required in performing the job. *Id*. Thus, whether plaintiff and Burns had equal jobs is a factual inquiry, dependent on their job requirements, not their job titles, and anchored around skill, effort, and responsibility. *Simpson*, 441 F.3d at 578.

The Court first sets forth a brief history of Burns' and plaintiff's job history. The record shows that in January 2002, Burns became Storeroom Supervisor. Prior to that time, Burns had been a Safety Manager at the Mill, and his PL was 13, with a salary of $68,473. When Burns moved into the Storeroom Supervisor job, his PL remained at 13, and his salary increased to $70,527. In March 2002, his salary increased to $72,290. After implementation of "One Job, One PL" in April 2004, Burns' PL (but not his salary) was lowered to 11 and his salary at that time was $73,736. In April 2005 Burns' salary increased to $75,211, and in April 2006, it increased to $78,219.

In July 1997, plaintiff was promoted to the Storeroom Supervisor position and she was assigned a PL 8 with a salary increase to $40,460, a more than $10,000 increase from her previous salary as a Draftsman. In July 1998, plaintiff's salary increased to $43,805, in July 1999, her salary increased to $45,557, and in May 2000, her salary increased to $47,379. In

March 2001, plaintiff moved into a Buyer position with a PL 8 and her salary remained at $47,379.  From March 2001 up to September 1, 2004, plaintiff remained a Buyer and her salary increased each year, with her salary in September 2004 being $56,754.  As previously noted, plaintiff sought to become a Senior Buyer to increase her PL, but the Mill did not have that position after April 2004 because of  "One Job, One PL."  Because plaintiff's PL could not be increased as long as she remained a Buyer, she needed to be placed in a different position that was graded at a higher PL.  Consequently, the Mill, after engaging in negotiations with corporate management, moved plaintiff to a PL 10 position, with the title of "Purchasing Supervisor."  The PL increase to 10 occurred on September 1, 2004, and plaintiff's duties did not change when she became Purchasing Supervisor.  Plaintiff's salary as Purchasing Supervisor remained at $56,754, and in April 2005 it increased to $57,889, which was her salary at the time of her termination on September 1, 2005.

A comparison of plaintiff's Buyer/Purchasing Supervisor position with Burns' Storeroom Supervisor position reveals that the two jobs are not substantially equal.  As Storeroom Supervisor, Burn's primary responsibility is to manage and safeguard the Mill's present $17 million dollar inventory located in three buildings while being responsible for supervising a crew of eleven hourly employees on three shifts.  Burns is responsible for inventory control, working with the Maintenance Department to determine what is obsolete, and managing internal controls. Burns performs some degree of buying in addition to his storeroom management responsibilities but the Buyers purchased in larger quantities than the Storeroom Supervisor.  As noted by Baymiller in response to a question asking whether he would agree that both plaintiff and Burns were Buyers, Baymiller replied, "I would state it this way.  [Plaintiff] was a Buyer. [Burns] was

the storeroom manager that had some buying responsibility."  In addition, Baymiller received reports from the Storeroom involving cycle counting, which pertained to inventory control, and he also received obsolete inventory reviews and data regarding obsoleting, which refers to taking items out of inventory that are no longer good and scrapping them.  Baymiller did not get specific reports from the Buyers.[17]

Plaintiff's Buyer/Purchasing Supervisor responsibilities, in contrast, were to negotiate contracts with suppliers for the Mill and purchase items not maintained in stock, which at the time of her termination entailed purchasing for the Pulp and Power area and some environmental source materials.  As stated by plaintiff, her responsibilities as a Buyer were "[t]o clear materials, contract[] with services, and assist the maintenance and productions in their need to operate.  I also did training, and assistance to other departments in resolving the mill process," and helped with the audits by answering the questions asked by the auditors.[18]   Plaintiff states that as a Buyer, she was responsible for purchasing "[a]lmost anything you can name, chucks, motors, electrical material, piping material, and production material, operation material, contractor services, and anything from doing the lawn to painting, installation, mechanical or electrical installations, rental, rental equipment ... keeping the rental equipment running."  Unlike Storeroom Supervisors, Buyers did not have any responsibility for inventory.[19]

In addition, plaintiff apparently had no supervisory authority over any employees, unlike

---

[17] Plaintiff states she "believes" Baymiller receives reports "taken from the SAP system that the Buyers and Storeroom Supervisor prepare."

[18] In management's view, plaintiff did not have training responsibilities, and Baymiller did not rely on her to provide training for employees who were not in the Purchasing Department.

[19] Plaintiff merely states she was responsible for "keeping watch" on certain non-stock items that were purchased on a repetitive basis.

Burns who supervised eleven employees.  Plaintiff "believes" that when she became a Buyer, she was the supervisor of Debra Hodges, who was the office clerk in the Purchasing Department, but plaintiff acknowledges she was told in December 2004 that she was not Hodges' supervisor and plaintiff acknowledges she never gave Hodges an evaluation or written discipline.  Rather, all the Buyers in the Purchasing Department would have directed Hodges to complete certain tasks, although plaintiff states Hodges was her "direct report."  In any case, even assuming plaintiff supervised Hodges, having supervisory authority over one employee does not compare to Burns' supervisory authority over eleven employees over three shifts.  *See Howard v. Lear Corp. v. EEDS and Interiors*, 234 F.3d 1002, 1005 (7th Cir. 2000) ("The additional skill, effort, and headache involved in managing three to six times the number of workers in a more complex employment environment rendered the ... positions ... substantially different"); *Krenick v. County of Le Suer*, 47 F.3d 953, 961 (8th Cir. 1995) (position of maintenance worker and maintenance engineer unequal where engineer carried additional responsibility of supervising assistant and serving as department engineer head).[20]

Plaintiff also briefly addresses the salary history of Robert Traweek in support of her EPA claim.  Plaintiff states that when Traweek was Storeroom Supervisor, he earned "about" $57,367 annually, and that upon being promoted to Purchasing Supervisor, in 1997, his salary increased to $60,861.  Plaintiff states she earned no more than $57,889 in the position and that had she been paid what Traweek was earning in 1997 (which actually was $54,120), she would have obviously earned more in view of the fact that, over time, salaries rise.  Traweek, however,

---

[20] Although plaintiff claims she was doing similar work to Burns, plaintiff told Eikamp that she wanted to "set-up" for Burns in the Storeroom Supervisior job when he was gone on extended times so that if he left she would be "trained, retrained, refreshed on, you know, what was going on."  According to Baymiller, "set-up" means actually assuming a position at a different pay scale.  Eikamp, however, did not allow plaintiff to "set-up" in the storeroom.

was Storeroom Supervisor from August 1985 to February 1997 and had over ten years experience in the job when he earned $54,120, whereas plaintiff had no experience in the job when she became Storeroom supervisor in 1997 with a salary of $40,560.  Traweek, then, is not a valid comparator and the differential in pay between the two is not evidence of pay discrimination.  *See Tenkku*, 348 F.3d at 741.

4.

The Court now turns to plaintiff's state-law defamation claim.[21]  Plaintiff, citing the deposition of Baymiller, states that upon her discharge, Staudt stated that plaintiff's conduct was dishonest and was an act of stealing from him and the company.   Plaintiff argues she was not dishonest and did not steal, as evidenced by IP's not denying her husband use of the bicycle, and yet Staudt "published before a third party that [she] had been dishonest and had stolen [from] both him and the defendant."  Plaintiff additionally notes she was publicly humiliated by being escorted off Mill property, "giving the impression that she has committed a moral offense," and that Eikamp announced to his staff that she had been terminated for gross violation of policy. IP, however, argues that plaintiff cannot maintain a defamation claim because Staudt's communications with Baymiller were subject to a qualified privilege as the communications concerned the reasons for the termination of an employee who was responsible for making

---

[21] The Eighth Circuit has held that when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the supplemental state claims are in most cases dismissed without prejudice to avoid needless decisions of state law as a matter of comity.  *See Birchem v. Knights of Columbus*, 116 F.3d 310, 314 (8th Cir. 1997) (citations omitted).  However, where discovery is completed and the case ready for trial, a court does not abuse its discretion in taking up and granting summary judgment on issues of state law on which there is little basis for dispute.  *Id*.  Here, discovery is complete, the case ready for trial, and this Court previously was required to address plaintiff's defamation claim in its Order denying her motion for joinder and for leave to amend her complaint.  *See* Order of November 21, 2006 [doc.#38].  That being so, and as there is little basis for dispute as to the resolution of plaintiff's defamation claim under settled Arkansas law, the Court will take up and resolve plaintiff's defamation claim.

purchases using the Mill's financial resources and that Eikamp's communication was both truthful and did not provide any more information than his interest or duties as a supervisor required.

Although a statement that is otherwise subject to a qualified privilege may lose that status under certain circumstances, such as excessive or malicious publication, *see Farris v. Tvedten*, 274 Ark. 185, 186 (1981), this Court has already determined in its November 2006 Order denying plaintiff's motion for joinder and for leave to amend that Baymiller did not specifically testify in the deposition excerpts relied upon by plaintiff that Staudt said that plaintiff was dishonest. Rather, in his deposition, Baymiller testified that Staudt "talked to his disappointment" in plaintiff's actions, and that "[h]e felt like he was – it was act of stealing from him and the company." It is unclear from this testimony whether Staudt actually stated that plaintiff's conduct was an act of stealing or whether Baymiller is describing his view of how Staudt felt. Indeed, Baymiller stated he could not recall whether Staudt said that plaintiff had been dishonest or had lied, and he could not recall whether Staudt said that plaintiff had been stealing or had stolen from the company, or whether Staudt had mentioned to plaintiff that other individuals had disobeyed him and that he was tired of people disobeying him. In any case, Arkansas law recognizes a qualified privilege for employers and supervisory employees dealing with matters that affect their business, *see Freeman v. Bechtel Const. Co.*, 87 F.3d 1029, 1031 (8th Cir. 1996), and Staudt's communication with Baymiller clearly would fall within the scope of this privilege.[22] In addition, Eikamp's informing his staff that plaintiff had been terminated for gross violation of policy, regardless of whether she should have been so terminated, was

---

[22] Plaintiff does not dispute that as Mill Controller, Baymiller had an interest in the decision to terminate an employee that he ultimately supervised.

truthful and did not add extraneous information. *See Andrews v. Mohawk Rubber Co.*, 474 F.Supp. 1276, 1281 (D.C.Ark. 1979).

Plaintiff argues that other employees inquired about her honesty in connection with the discharge, that she lost her position on the Pine Bluff Character Council, and that even her husband was approached by a Mr. Bennett about her discharge, but plaintiff submits little if any supporting evidence in support of these vague assertions, and they do not otherwise suffice to allege publication to a non-privileged third party. *See Freeman*, 87 F.3d at 1031-32 (claim that allegations of sexual harassment were "orally published around the whole job site and the town of Russellville" did not suffice to identify the manner of oral publication and did not allege that defendant – that is, an agent of defendant acting within the scope of that agency – published the statements to a non-privileged recipient). *Cf. Pighee v. L'Oreal USA, Inc.*, 351 F.Supp.2d 885, 895 (E.D.Ark. 2005) (no communication to a non-privileged third party established for purposes of summary judgment based on the fact that "people on the floor" of the facility knew about allegations of sexual harassment). Plaintiff simply has not demonstrated with evidence sufficient to defeat summary judgment that the privilege was abused by excessive publication, by use of the occasion for an improper purpose, or by lack of belief or grounds for belief in the truth of what was said. *Richmond v. Southwire Co.*, 980 F.2d 518, 520 (8th Cir. 1992) (citing *Ikani v. Bennett*, 284 Ark. 409, 413, 692 S.W.2d 747, 749 (1985)).


III.

For the foregoing reasons, the Court denies plaintiff's motion for summary judgment on the issue of liability [doc.#50] and grants IP's motion for summary judgment [doc.#54].

Judgment will be entered accordingly.


IT IS SO ORDERED this 17th day of September 2007.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE